Booth, Chief Justice,
delivered the opinion of the court:
On March 29, 1926, a written contract was executed by the Duluth-Superior Dredging Company, plaintiff, and Lieut. Col. E. J. Dent, Corps of Engineers of the Army, representing the United States. The work to be performed under the contract was the dredging of Maumee Bay and River channels, Ohio.
The case involves a single isstie. The plaintiff excavated 2,383,374 cubic yards of material and was paid for excavating 2,245,822 cubic yards, leaving, as is claimed in this suit; a balance due it of $28,885.92; i. e., for excavating 137,552 cubic yards of material at the contract price of twenty-one .cents per cubic yard, which was not paid.
The defendant rests the defense on certain provisions of the contract, insisting that the method of ascertaining cubic yards of material excavated by the plaintiff limits payments t herefor to the sum ]3aid the plaintiff, and recovery for the *917 sum is precluded, it not being disputed that the plaintiff did actually excavate 2,383,374 cubic yards .of material, and that the 137,552 cubic yards for which no payment was made were “shoalings” which occurred in the .areas involved subsequent to .the completion of excavation •therein.
Paragraph 34 of the specifications vested in the contracting officer plenary authority to' direct the conduct of the work, and paragraph 19 of the same document detailed the -work to be done and the manner of doing it. The channel •to be dredged was about 30,000 feet in length, the depth to be obtained was- “21 feet below low-water datum (elevation .570.8 feet) in those portions where a less depth than twenty-one feet exists, and shall have a total bottom width of 400 ■feet.” The channel was divided into four distinct sections, .and the plaintiff was required by the contracting officer to dredge the south one-lialf of the width of the channel of sections 1 and 2 and the greater portion of section 3 before beginning to dredge the north half of said area.
The plaintiff in the year 1926 completed performance of its contract work in accord with the specifications and did dredge the south half of sections 1 and 2 and a portion of section 3, and was engaged in dredging the north half of section 1 when on or about December 4, 1926, winter weather and ice conditions caused a cessation of work. In 1926, as dredging work under the contract proceeded, contract officials made soundings or sweepings immediately before dredging operations commenced, and followed this up by a similar procedure when the excavation in the areas was completed, and, upon the data thus obtained, monthly estimates of the yardage of excavation shown therein disclosed that plaintiff had met the exact requirements of the contract ■ ;as to depth and width, and that none of the dredging “so shown fell outside the limits provided in the sepecifications.”
In July 1927 the. contracting officials made final soundings and sweepings of section 1 of the work area, and by making a comparison of the data thus obtained with the data of. the soundings and sweepings obtained coincident with the performance of the work in 1926, it was discovered that *918 sboalings to the extent of 88,764 cubic yards bad taken place in said section, and by employing a similar procedure in August 1927, shoaling to the extent of 48,788 cubic yards was disclosed to have occurred in that qiortion of section 2 which plaintiff had dredged in 1926.
The plaintiff was not required' to remove any poi’tion of' the shoalings from the areas dredged. The defendant tendered it, in final settlement for the work done, a payment, predicated upon a measurement of the area dredged, as stated above, taken before the work commenced, and the cubic contents of the same area when the work was completed, thereby deducting from the actual amount of material dredged by the plaintiff the quantity of material which found its way into the dredged area, i. e., shoaling, long after the plaintiff had completed its work therein.
The defendant justifies the reduced sum paid the plaintiff for the quantity of material actually dredged, by a construction of certain paragraphs of the contract and specifications to which we refer later. It is first essential to set out the provisions of the contract and specifications which we think stipulate the sum to be paid the contractor for performance of the contract work in accord with the provisions of the same. It is not disputed that under article 1 the contractor was to “receive payment at the rate o? twenty-one (21) cents per cubic yard, place measurement.”'
Paragraph 30', entitled “Method of measurement”, is as follows:
“The material will be measured by the cubic yard in place by means of soundings or sweepings taken before and after-dredging. The maps already prepared (par. 21) are believed to represent approximately the existing condition; but they will be replaced by other maps showing soundings taken shortly before dredging is begun in any locality. Soundings or sweeping will be made behind the dredge as the work progresses, and so far as practicable, the contractor will be advised of the result before anchors are shifted. Monthly deductions for excessive overdepth or side-slope dredging (par. 26) and monthly payments for approximate net results will be based upon these surveys.”-
Paragraph 17, entitled “Payments”, is as follows:
“Payments will be made monthly on estimates of such, material as has been excavated and deposited in accordance *919 with the specifications and not included in any prior estimate, except that 10 percent of the amount of each estimate will be retained until the work is 50 percent completed; and thereafter with each monthly payment there will be-paid such portion of the amount so retained as is in excess of 10 percent of the estimated cost of completing the work, remaining to be done, until the amount retained is reduced to $10,000, after which it will remain unchanged until the full completion of the work.”
The character of the work involved necessitated the paragraphs quoted. Soundings and sweepings depicted the quantity of material dredged, and the additional fact as to-whether the dredging operations coincided with the area specified to be dredged for which the contractor was only to be paid. The language of paragraph 30 obligates the defendant, unless some other provision of the contract precludes it, to pay the contractor at the contract rate for allí material actually excavated within the limits of the contract area. That payments were to be made in accord therewith is obvious from paragraph 17. They were to be made monthly “on estimates of such material as has been excavated and deposited in accordance with the specifications” less certain retained percentages.
The defendant insists that paragraph 31 of the specifications provides expressly for a method of measurement and therefore a basis of payment which limits the quantity of' dredged material to be paid for to measurements taken before dredging operations and those taken when the contract work was completed, a contention which in effect nullifies paragraph 30 and places upon the contractor the-assumption of all risks which may through no fault of it materially reduce the quantity of material admittedly-dredged in compliance with the contract and specifications, and for which estimates had been made, approved, and payments made therefor under paragraph 17.
Paragraph 31 (following as it does paragraph 30), under-the general heading of “Measurement” and entitled “Final examinations and acceptance”, is as follows r
“As soon as possible after the completion of' the entire-work, or of such sections established in paragraph 19 as in*, the opinion of the contracting officer will not, be subject to> *920 injury by reason of further operations under the contract, .such area will be thoroughly examined by sounding and by .sweeping, as deemed advisable by the contracting officer. ■Should any shoals, lumps, or other lack of contract depth be disclosed by this examination, the contractor will be required to remove them by dragging the bottom or by ■dredging, at the contract rate for dredging; but if the bottom is soft and the shoal areas áre small and form no material obstruction to navigation, the removals of such .shoals may be waived, in the discretion of the contracting •officer. The contractor or his authorized representative will be notified when soundings are to -be made, and will be ¡permitted to accompany the sounding party. When the ■ entire area or any established section is found to be in satisfactory condition, the work therein will be finally accepted.
“Final estimates will be based on the differences between the last soundings made before dredging and the results of the last examination, subject to proper deductions or correction of deductions for excessive overdepth dredging or excessive side-slope dredging (par. 26). Final acceptance of the whole or a part of the work and the deductions or corrections of deductions made thereon will not be reopened, •after having once been made, except on evidence of collu■■sion, fraud, or obvious error, and the acceptance of a completed section shall not change the time of payment of the retained percentages of the whole or any part of the work stated in paragraph 17.”
A final examination and acceptance of the contract work ‘was of course essential. The defendant under paragraph 17 (supra) had in its possession the retained percentages provided for, and to ascertain compliance with the contract ■•and specifications such an examination must precede a final settlement with the contractor. Paragraph 31 authorized the contracting officer to finally examine and accept each of the separate sections of the area to be dredged without waiting for a completion of all. It conferred upon that official a wide discretion with respect to forming a judgment as to ■whether the contractor had met its contract obligations, and .finally set out what should be done when the survey of the area had been completed and time for payment arrived.
Paragraph 31 manifestly points out the established way of ascertaining compliance with the contract, and if upon such .an examination the area to be dredged disclosed “shoals, lumps, or other lack of contract depth”, incidental impedi-' *921 ments to accomplishing the intended purposes of the contract work, the contractor might in the discretion of the contracting officer be required to correct the situation, it however to be paid the contract price for so doing.
Paragraph 31 must be read and construed as a provision for final examinations and acceptance. It is not susceptible to a division into a provision for two distinct purposes, one for examination and acceptance and the other for estimates for final payments for materials actually dredged and paid for prior to this period. It has to do with contract work remaining unperformed and imperfections in work already performed.
The defendant predicates its argument upon a subpara-graph of paragraph 31 which we think provides only for final estimates in the event they become essential by reason of the provisions of the first paragraph. We say this with a degree of confidence because even the final paragraph of 31 limits deductions to be made from any final estimates “to proper deductions or correction of deductions for excessive over depth dredging or excessive side-slope dredging (par. 26).” Paragraph 30 we think provided for the method of ascertaining the quantity of material to be dredged; paragraph 17, the method of payment, and paragraph 31, for final examination and acceptance.
The record establishes that the material which shoaled into the excavations properly made by the contractor did so through no fault of it, and it is conceded that at the time of final examination of the contract work the officials who made the examination knew and recognized this sitúa-' tion to be true. They also knew — at any rate they should have known — of the previous estimates and the work accomplished by the contractor, and obviously they were cognizant of paragraph 32 of the specifications which we quote below:
“Shoaling. — Should the last examination of the contract work extended to include the entire area, show shoaling since the previous season’s work, or shoaling for which the contractor is evidently not responsible, and which shall include shoals in the finished channel formed by the natural lowering of 'side slopes, -between the time of dredging and that of the *922 last examination herein referred to, redredging at the contract price, so far as permitted by available funds, may be done if agreeable to both the contractor and the contracting-officer.”
It is difficult to read inconsistencies into paragraphs 30 and 31 of the specifications. They both have distinct purposes and provide for distinctly different contractual action. The first one in connection with paragraph 11 and 26 fixes the-method of measurements upon which progress payments are-to be made, and the second sets' forth the method of measurements available to ascertain additional payments in the event the final examination discloses a liability therefor. Assuredly it was not the intention of the parties that the-contractor guarantee the status quo of the dredged channel after it had completed its contract work in accord with the contract. The contractor was under no contractual liability-other than to perform the work as it was specified to be performed, and if it did not accomplish the intended purpose of the defendant the fault is not chargeable to the one who possessed no discretion or right to perform it otherwise than it was performed.
If the defendant’s position is invulnerable the contractor-might have, without fault, been charged with twice or thrice-the quantity of shoaling falling into the completed areas of excavation, and thereby deprived of all legitimate profit of the undertaking. This we think is made indubitably plain by the provisions of paragraph 26 of the specifications:
“26. Overdepth dredging and side slopes. — To cover unavoidable inaccuracies of dredging processes, material actually removed to a depth of not more than 2 feet below the required depth will be estimated and paid for at full contract price.
“ Material actually removed, within limits approved by the contracting officer, to provide for final side slopes not flatter than 1 on 4 but not in excess of the amount originally lying above this limiting side slope, will be estimated and paid for, whether dredged in original position or after having fallen into the cut. In computing the limiting amount of side-slope dredging, net dimensions, without allowance for overdepth, will be used. Material taken from beyond the limits above described will be deducted from the estimates as excessive overdepth dredging, or excessive side~ *923 slope dredging, and will not be paid for. Nothing herein shall be construed to prevent payment, under the provisions of paragraphs 31 and 32, for the removal of shoals within the limits of dredging prescribed in paragraph 19, whatever the ultimate source of the material in such shoals.”
Defendant resorts to another defense which we think does not exact extended comment. The amount of material to be excavated was estimated (par. 21 of specifications), a time limit for performance of the work was stipulated, and the defendant states that if the contractor had prosecuted the work in 1926 with the estimated speed disclosed, shoaling would not have occurred, at least until too late to charge its occurrence to it. The answ7er to the contention is found in the conceded fact that the time limit for performance was extended by the defendant. No penalties of any sort were charged to the contractor for delay in performance {finding IY).
• The defendant’s final contention is placed upon article 43 <of the specifications. The article is as follows:
“Claims and protests. — If the contractor considers any work required of him to be outside the requirement of the •contract, or considers any record or rule of the inspector or •contracting officer as unfair, he shall ask for written instructions or decision immediately, and then file a written protest with the contracting officer against the same within 5 •days thereafter or be considered as having accepted the record or ruling.”
The plaintiff protested final payment and insisted upon receiving the sums due under its contract. This was perhaps not done in an effort to comply with article 48, and it was not necessary. The findings show that the contract work ihad been performed and the dredging done within the prescribed limits.
The controversy was not one originating during the performance of the contract nor did it grow out of any record ■or rule of an inspector challenged by the plaintiff in the course of performance. The issue here is one of payment. The plaintiff is not seeking compensation for extra work or work outside the contract; its complaint is that payment was withheld for work it actually performed in accord with the contract. The plaintiff had no opportunity to protest *924 until the date it did protest. The cases cited by defendant are inapposite.
: Article 43 is directed to perfoi*mance of the contract in course. Its terms are intended to facilitate performance and set up a method of adjudicating differences between parties occasioned by rulings of an inspector or the contracting officer, with respect to the matters mentioned in the article. The language of the article discloses the intention of the same; it has no application to payment provisions of the contract when it positively appears that during the course Of performance it was not invoked, and an admission that the contractor dredged the precise amount of excavation the contract required him to dredge.
’ Judgment for plaintiff for $28,885.92. It is so ordered.
. Whaley, Judge/ Williams, Judge; Littleton, Judge; and Green, Judge, concur.